IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KEVIN PLACE,                                        Civ. No. 06-6160-HO

               Plaintiff,                       ORDER

    v.

CITY OF EUGENE, et al.,

               Defendants.


    Plaintiff alleges employment discrimination, retaliation and
related claims under 42 U.S.C. §§ 1981 and 1983, Title VII,
federal and state medical and family leave laws, and other state
laws.  Defendants filed a motion for summary judgment and motion
to strike evidence.

    Summary judgment is appropriate if there is no genuine issue
as to any material fact and the movant is entitled to judgment as
a matter of law.  Fed. R. Civ. P. 56(c).   The court may strike
immaterial or impertinent matter from a pleading.  Fed. R. Civ.
P. 12(f).  As discussed below, plaintiff fails to produce
evidence from which a reasonable juror could return a verdict in

his favor.  Therefore, defendants' motion for summary judgment is granted, defendants' motion to strike is denied as moot, and this action is dismissed.

<u>Undisputed Facts</u>

The following facts are undisputed, not reasonably susceptible to dispute or derived from the evidence viewed in the light most favorable to plaintiff.

Plaintiff Kevin Place, an Hispanic male and person of color, began his employment as a paramedic/firefighter for the City of Eugene, Oregon Fire Department (EFD) on January 4, 1999.  He remains so employed.  At material times, Dr. Richard Kozak authorized plaintiff to perform medical procedures under "standing orders."

In 2004, plaintiff's partner witnessed plaintiff inject medication into a patient at an unconventional site on the patient's body.  Prior to the injection, plaintiff and his partner determined the unconventional site due to the patient's size.

On June 22, 2005, plaintiff and paramedics Jon Deininger and Isaac Stott transported a patient after plaintiff had "intubated" the patient with an endotracheal breathing tube.  Plaintiff drove the ambulance to the hospital, while Deininger and Stott rode with the patient in the back of the ambulance.  At the hospital, Dr. Kozak found the tube misplaced in the deep right main stem

2 - ORDER

bronchus and extracted the tube to an appropriate level.  Later, plaintiff commented to Dr. Kozak about the intubation.  Dr. Kozak perceived the comment as flippant.  At the time of this interaction with plaintiff, Dr. Kozak was unaware that plaintiff, as the driver, did not treat or monitor the patient during transport.

Dr. Kozak passed along chart notes of the intubation for to Deputy Chief Matt Shuler, who acted in place of Emergency Medical Services (EMS) Chief Joanna Kamppi.  Dr. Kozak told Shuler "that we needed to look at this further."

In late July or early August, 2005, Dr. Kozak asked Kamppi if she had received the chart notes of the intubation.  She had not, and was unaware of the incident.  Kamppi then asked Shuler for a copy of the chart notes.  Shuler told Kammpi to contact Chief Randy Groves and district chiefs to do an investigation.  Kamppi testified that "pursuant to "chain of command," she would have contacted Chief Randall Groves, but she does not specifically remember doing so.  Kamppi contacted Deputy Chief Joe Zaludek.

On July 21, 2005, female Caucasian paramedic Torkelson confronted plaintiff in a medical center workroom about an incident which had occurred earlier in the day.  Torkelson tried to engage plaintiff in argument three or four times.  Plaintiff repeatedly told her he did not want to discuss the incident at

that time, and Torkelson left visibly upset.  Torkelson
complained to plaintiff's supervisor that plaintiff was
argumentative.  On July 22, 2005, Zaludek conducted a fact-
finding investigation.  During the interview, Zaludek refused
plaintiff's request to use the restroom.

On August 31, 2005, plaintiff received a written reprimand
for unprofessional and disrespectful conduct toward Torkelson
during the July 21, 2005 shift.  Zaludek Aff., ex. 2.  The
reprimand also notes two concerns regarding plaintiff's care of
patients during that shift.  Id. at 2-3.  Zaludek found that
plaintiff (1) improperly transported a patient in the front seat
of the ambulance and (2) committed errors in medication
administration, communication and documentation with respect to
another patient.  Id.  On the date of the reprimand, plaintiff
was on a disciplinary step for a prior written reprimand for
disrespectful and unprofessional behavior.  Id.  Zaludek wrote
that plaintiff has seven documented occurrences of disrespectful
communications in a approximately five years of employment, and
four documented incidents of errors in administering medications.
Id. at 3.  Torkelson received coaching for the incident.

After meeting with Groves, Zaludek, Kammpi and City Human
Resources Manager Helen Towle, Dr. Kozak suspended plaintiff's
standing orders on September 8, 2005.  Later that day, Zaludek
and Kammpi interviewed plaintiff in the presence of union

president Scott Olmos and vice president Joe Siebert.  Plaintiff received a copy of the memorandum memorializing the suspension of his standing orders.  The memorandum provides that an investigation shall be conducted and until further notice plaintiff "may only act in a first response capacity, applying basic first aid under the direction of another EMT."  Pl's ex. 1 at 41.

In an e-mail dated September 9, 2005, Groves asked Zaludek whether he and Kammpi were able to find the report for the call involving the intubation.  Groves told Zaludek that Olmos told him that although plaintiff inserted the tube, plaintiff was the driver.  Groves told Zaludek, "[w]e need to also interview Kevin's partner . . . and find out what happened from their perspective, e.g. was Kevin actually the driver or did he ride in the back, if not, why didn't they catch that the tube was inserted too far, etc."  Groves asked Zaludek to forward his notes to Helen Towle and himself.  Pl's ex. 3 at 25.

Zaludek responded to Groves's inquiry by e-mail on September 12, 2005, with copies to Kamppi and Towle.  Zaludek reported finding the patient care form, which documented that plaintiff placed the tube.  Zaludek further reported that he would get Deininger's perspective when Deininger returned from vacation.  Zaludek told Groves that plaintiff said he did not use wave form capnography to determine tube movement, and did not remember

using the end cap CO2 monitor.  Zaludek reported that plaintiff

told him that Deininger said he would pull the tube up during

transport, and that "[w]hen asked if he listened to the lung

sounds himself per protocol, he said that his partner listened to

lung sounds after the initial intubation and that he had not."

Zaludek closed by stating he "will get statements from Stott and

Deininger next day."  Id.

In a September 12, 2005 e-mail to Zaludek and Groves, copied

to Kamppi, Towle asked, "So was Deininger the paramedic on the

unit who rode in back with the patient?"  Id.

On September 13, 2005, Groves sent an e-mail to Dr. Kozak.

> In regards to Kevin Place's situation, we have learned
> that although Kevin inserted the ET tube on the call in
> question, he was the driver and may not have been in
> the back with the patient for the ride to the hospital.
> We will be interviewing more personnel tomorrow to
> confirm this or disaffirm this report.  We still have
> concerns about Kevin's ability to perform and we
> recognize your decision to suspend is based on multiple
> events.  Never-the-less, we want you to have all of the
> facts in this situation.

Groves Aff., ex. 1 at 3.

In a September 14, 2005 e-mail to Towle and Groves, copied

to Kamppi, Zaludek wrote,

> Deininger was the Engineer/Paramedic that rode in the
> back of the unit to the hospital.  I spoke with Jon
> today and he remembered the discussion that the crew in
> back was going to raise the tube enroute.  The
> paramedic in charge was Issac [sic] Stott.  I spoke
> with him as well and he stated that the tube was pulled
> up some enroute but he did not want to lose the tube
> while driving code 3 to the hospital.  He remembered it
> being adjusted again at the hospital.  This was a team

6 - ORDER

    effort.  Kevin was responsible for the placement of the
    tube but Stott was the lead medic in charge of patient
    care and had responsibility for monitoring the patient
    enroute.  The response that Kevin gave to Dr. Kosak
[sic] when he found out that it was in the right mainstem was
less then [sic] professional.  I'm interested in Dr. Kosak's
[sic] perspective on that issue.

Id.

     Groves sent another e-mail to Dr. Kozak on September 15,

2005.  "So far we've found out that Kevin did place the tube

wrong to begin with, we're still looking at what happened next."

Pl's ex. 2 at 29.

     Kamppi sent a letter and form dated September 30, 2005, to

the Oregon Department of Human Services.[1]  The correspondence

advises that Dr. Kozak revoked plaintiff's paramedic standing

orders.  The letter recounts four incidents that caused Dr. Kozak

to question plaintiff's abilities as a paramedic, including

plaintiff's administration of pain medication to the calf muscle

of a patient with a fractured ankle, two written reprimands for

unprofessional and disrespectful communications, and the

intubation incident.  Kamppi wrote that plaintiff performed an

intubation in which the tube was grossly placed in the right

main-stem, and that plaintiff was flippant and disrespectful to

_____

     [1]Certain health care facilities, physicians, ambulance
owners and others are required to report to the Department of
Human Services any information they may have "that appears to
show that an EMT is or may be medically incompetent, guilty of
unprofessional or dishonorable conduct or mentally or physically
unable to safely function as an EMT."  Or. Rev. Stat. § 682.220.

7 - ORDER

Dr. Kozak during a conversation about the tube placement.  Pl's ex. 1 at 42-43.  The penultimate sentence of the letter provides, "All the incidents stated above have been thoroughly investigated and documented by the City of Eugene Fire and EMS department." Id. at 42.

Plaintiff took medical leave on October 8, 2005.  Zaludek and/or Groves placed plaintiff on paid administrative leave on October 11 or 12, 2005.

On October 13, 2005, plaintiff spoke by telephone with Eugene Human Resources Manager Lauren Chouinard about concerns of discrimination and harassment.  Place Depo. at 188:6-9.

In an October 14, 2005 letter to Groves, Dr. Kozak wrote,

> After a thorough review and discussion of medical
> incidents involving paramedic Kevin Place, it is
> necessary at this time to remove Kevin from the
> practice of paramedic for the City of Eugene.  Despite
> remediation attempts and training, Kevin has continued
> to show a lack of adequate skill and judgment to serve
> the community of Eugene as a paramedic.  He may not
> continue to practice under my license.

Pl's ex. 1 at 49.

Plaintiff complained to the city in writing on October 17th, 2005, that the responsible Caucasian employees were not disciplined for the improper intubation for which plaintiff was disciplined.  Place Depo. 122:14-25.

In an e-mail dated October 19, 2005, plaintiff recounted the conflict with his partner during his July 21, 2005 shift. Plaintiff wrote that Chief Zaludek refused his request for a

8 - ORDER

restroom break during the investigation of the incident, plaintiff was not treated "as a similarly situated employee," and plaintiff wanted "to be treated equally and fairly."  Pl's ex. 1 at 71 (Place Depo. ex. 25).

On October 20, 2005, Groves issued a memorandum notice of proposed termination to plaintiff.  The notice contains the following information.  The June 2005 intubation incident and the July 21, 2005 shift precipitated the September 8, 2005 meeting requested by Dr. Kozak to discuss plaintiff's medical skills and complaints about plaintiff.  Dr. Kozak suspended plaintiff's paramedic standing orders on September 8, 2005.  Dr. Kozak was concerned about the care provided by plaintiff and plaintiff's responses when Dr. Kozak attempted to speak with plaintiff about the incidents.  The investigation conducted by Zaludek and Kamppi substantiated Dr. Kozak's concerns.  Zaludek and Kamppi informed Dr. Kozak of the results of their investigation.  On October 14, 2005, Dr. Kozak informed Groves that he would no longer permit plaintiff to practice emergency medicine under his licences above the EMT-basic level.  As required by statute, the EFD served notice of plaintiff's situation to the Oregon Health Division. Groves proposed terminating plaintiff from the EFD and provided October 31, 2005, as the deadline for plaintiff to submit a written response and schedule an oral response.

After receiving the notice of proposed termination,

plaintiff sent a letter to Dr. Kozak containing the following information. Plaintiff correctly placed the endotracheal tube, while another paramedic confirmed the correct placement using a stethoscope. Plaintiff then turned over airway management to another paramedic. Plaintiff then secured the tube and advised other paramedics to use extreme caution in ventilating because plaintiff had removed the patient's dentures. Plaintiff retrieved the backboard and gurney and plaintiff and the other paramedics moved the patient out of her residence. Deininger was in charge of airway management for the patient. Plaintiff suspected and confirmed with auscultation that the tube had moved after the paramedics moved the patient. Plaintiff asked Deininger to readjust the device and Deininger indicated he would address the device in back of the ambulance. Plaintiff and the other paramedics loaded the patient in the ambulance and plaintiff drove the ambulance to the hospital. Plaintiff apologized for his demeanor and tone with Dr. Kozak during past encounters, and stated that he had not understood that Dr. Kozak had not been informed that plaintiff was the driver and had not been in charge of airway management in the back of the ambulance during transport of the intubated patient.

Plaintiff further informed Dr. Kozak that he considered the July 21, 2005 encounter with Torkelson to be trivial. He explained that he kept his interactions polite and professional

despite his partner's repeated attempts to engage him in argument. Plaintiff explained why he made certain patient care decisions which his partner suspected were negligent. Plaintiff conceded that he once administered the wrong medication when he was a new paramedic in 1999. Plaintiff also wrote that he should have called ahead before giving "an IM injection to a morbidly obese patient in an unconventional site due to her size." Plaintiff wrote that the information provided to Dr. Kozak was inaccurate or incomplete. Pl's ex. 1 at 78 (Place depo. ex. 26).

On November 8, 2005, Dr. Kozak sent an e-mail to Groves. Dr. Kozak informed Groves that plaintiff had sent him numerous e-mails and letters, including "names/phone numbers for contact and verification of his side of the story . . ." Dr. Kozak wrote that he agreed that "an investigation of some sort is indicated, because if we made our final decision (re intubation) to terminate based on inaccurate information, that seems inappropriate despite prior instances . . . with the whole due process idea." Pl's ex 2 at 32.

On November 11, 2005, plaintiff sent an e-mail to Chouinard, with copy to Groves. Attached to the e-mail was a document titled "A chronological timeline in regards to the alleged negligence involving FF/PM Kevin place," prepared by plaintiff and his "civil rights advocate." The timeline includes the following information. As of September 15, 2005, the city was

made aware of plaintiff's role on the June 2005 intubation call
seven times, yet insisted on harassing plaintiff.  There is no
traceable evidence that Groves further advised Dr. Kozak of
material facts exonerating plaintiff.  The medical chart clearly
illustrates that Stott deemed the tube correctly placed at 0853.
The city never concluded that Stott and Deininger were the true
responsible parties.  The city did not have to report this
alleged negligence to Dr. Kozak or the State of Oregon.  The city
did not act in good faith and "clearly wants to terminate Mr.
Place without due process and avoiding [sic] his equal rights."
Pl's ex. 1 at 77 (Place depo. ex. 29).

On November 15, 2005, plaintiff sent an e-mail and
attachment to Chouinard.  The attachment discusses issues
discovered during a review of plaintiff's personnel file
conducted by plaintiff and his civil rights advocate.  In the
attachment, plaintiff highlights positive reviews found in his
file and challenges several of the reasons for the proposed
termination cited in the notice of proposed termination.
Plaintiff further states that Captain Sorter is on record
inquiring why plaintiff is treated differently, plaintiff can
prove he is treated differently, plaintiff can prove "knowledge,
intent and malice in regard to my protocols being suspended prior
to the City even looking at the chart in question," and plaintiff
has supporting documents that illustrate differential treatment.

12 - ORDER

Pl's. ex. 1 at 81 (Pl's Depo. ex. 30).

In correspondence to Chouinard dated November 17, 2005, plaintiff recounts documented incidents regarding his employment from 1999 through October 2005.  Pl's ex. 1 at 86 (Pl's Depo. ex. 31).  In this correspondence, plaintiff challenges findings that he was at fault in approximately 15 incidents with allegations ranging from interactions with patients and co-workers to compliance with medical and non-medical procedures.  Plaintiff repeatedly questions why he was found at fault, states that he was not at fault or that incidents did not happen, states that incidents should not have resulted in discipline, and states that he was singled out for discipline while culpable individuals were not.  Plaintiff also alleges that in August 2004, two paramedics were not disciplined for negligently ventilating a patient. (Plaintiff testified that these paramedics are Caucasian.) Plaintiff further questioned whether after the intubation incident, EMS Chief Kammpi invented a policy that whoever intubates a patient must "follow it to the hospital," in order to facilitate disciplining plaintiff.  Plaintiff further questions why his credentials were suspended prior to review of the chart of the June 2005 intubation.  Plaintiff closes the correspondence by questioning whether the city wants to harass him and his family and treat him unfairly without due process and equal rights because he is Hispanic American.  Id.

13 - ORDER

On November 22, 2005, Groves issued a memorandum to plaintiff with the subject line "DUE PROCESS (Continuation)." Groves Aff., ex. 2 at 5.  Groves wrote that he has been reviewing all of the information related to the final decision regarding the proposed termination of plaintiff's employment, including a November 2, 2005 memo submitted on behalf of plaintiff by Union Attorney Mike Tedesco, and approximately 18 communications submitted by plaintiff or others on behalf of plaintiff.  Id. Groves informed plaintiff that "we are taking this additional step in the process" in response to concerns raised by plaintiff and Tedesco that Dr. Kozak may not have been given all relevant information regarding the incidents that led to his decision to discontinue plaintiff's standing orders.  Id.  Groves provided a time for plaintiff, with or without a union representative, to provide Groves, Kammpi and Dr. Kozak with additional information. Groves also permitted plaintiff time to submit additional information in writing.

On November 28, 2005, plaintiff sent an e-mail with attachment to Groves, and copy to Dr. Kozak.  The attachment consists of a letter to Groves from plaintiff, dated November 25, 2005.  Later that day, plaintiff sent an e-mail to Chouinard, and copy to Dr. Kozak, in which plaintiff stated that the facts of the intubation incident are clearly outlined on the medical chart, including the fact that clear and equal bilateral lung

14 - ORDER

sounds were confirmed by primary and secondary means.

In a memorandum to Groves dated November 28, 2005, Zaludek documented fact-finding based on his re-interview of crew members present "when Kevin Place performed a right main stem bronchus intubation on 6 June 2005."  Pl's ex. 2 at 35.  Zaludek acknowledged plaintiff's statement that a paramedic confirmed lung sounds, but concluded after questioning all crew members that he could not determine who actually listened to the patient's lung sounds.  Id.  Zaludek confirmed the fact that the tube was initially placed too deep.  Id.

Later on November 28, 2005, Groves sent an e-mail to Dr. Kozak, informing him that Zaludek completed the second interviews of the personnel involved in the intubation incident.  Groves Aff., ex. 1 at 6.  "Zaludek . . . confirmed that Kevin did turn over the patent [sic] with the ET inserted incorrectly.  In addition, none of them remembered listening for breath sounds as claimed by Kevin."  Id.

On December 28, 2005, Zaludek issued a memorandum to Groves concerning yet another re-interview of Deininger and Stott on December 16, 2005.  Groves Aff., ex. 1 at 8.  Zaludek found that plaintiff performed the initial intubation, the esophagus was intubated on the initial attempt and then removed, and the patient was re-intubated.  Deininger and Stott agreed that end tidal $CO_2$ was not checked initially with Easy Cap, wave form

15 - ORDER

capnography was not used, and no crew member remembered who listened to initial lung sounds. An EKG strip that would show wave form documentation was not attached to the chart. Deininger took control of the airway after initial intubation. Stott heard a discussion between plaintiff and Deininger about adjusting the tube in the medic unit and the decision was made to do so. Stott and Deininger took responsibility for the airway after the patient was loaded into the ambulance and adjusted the tube after securing the patient for transport. Deininger immediately adjusted the tube depth until Stott heard bilateral lung sounds. Stott did not agree with the statement that the tube was grossly misplaced upon arrival, as the placement was confirmed by lung sounds in the back of the medic unit and a 100% SPO2 reading at the end of transport. Deininger and Stott thought the tube was somewhat deep, but the tube was manipulated a minimal amount during a code 3 return so they would not lose the tube enroute. There was speculation, but not evidence, that the tube could have slid in more during transfer of the patient to the hospital bed. Groves Aff., ex. 9.

A February 2, 2006, memorandum "NOTICE OF SUSPENSION AND RETURN TO WORK" issued by Groves informs plaintiff, "after fully reviewing your situation and the information we obtained from follow up interviews, Dr. Kozak has decided to reinstate your standing orders, with restrictions, and we in turn have decided

to bring you back to work." Pl's ex. 1 at 65. EFD imposed a
two-shift suspension without pay for "continued performance
deficiencies," disrespectful and blame-avoidant communications
from plaintiff to Dr. Kozak, and because plaintiff was "on
current disciplinary step at a Written Reprimand." Id. The
memorandum states that Dr. Kozak did not have complete knowledge
of the intubation incident before he suspended plaintiff's
standing orders and that the incident, coupled with plaintiff's
disrespectful response to Dr. Kozak, prompted the review of
plaintiff's performance record. Id. at 63. Regarding the
intubation incident, the memorandum states,

> [W]e confirmed that you did play a lesser role than we
> had originally understood. However, it is clear that
> you again did not follow protocol in this incident and
> then responded in an inappropriate manner when the
> incident was brought to your attention by Dr. Kozak.

Id. Finally, Grove explained,

> Had Dr. Kozak not reversed his decision to revoke your
> standing orders, we would have terminated you because
> you would have no longer been able to meet an essential
> condition of employment. However, because he has
> reversed his position based on our investigative
> findings, you are gaining another change at your
> career.

Id.

Stott and Deininger received documented counseling reports
for their roles in the June 22, 2005 intubation. Zaludek found
that Stott in particular violated department and city policies
and applicable paramedic protocols requiring that electronic

17 - ORDER

continuous end tidal CO2 be established on every intubated
patient.  Pl's ex. 9 at 19-20.

After a fact-finding stemming from a 2004 call involving an
intubated patient, a Caucasian female paramedic was not
disciplined for providing another paramedic with apparently
incorrect information that a patient's lung sounds were good.
Pl's depo. at 226.

No EFD employee has made harassing statements to plaintiff
about the facts that plaintiff is Hispanic and male.  Plaintiff
has the most extensive disciplinary record of EFD paramedics.

Discussion

Plaintiff's theories of recovery and claims include the
following: disparate treatment and hostile work environment on
the bases of race, color, national origin and sex; unlawful
interference with medical leave; retaliation for opposition to
discrimination and pursuit of benefits; intentional infliction of
emotional distress (IIED), and denial of due process and equal
protection in violation of the Fourteenth Amendment to the United
States Constitution.  Defendants argue that they are entitled to
summary judgment because plaintiff's claims lack sufficient
factual support.

I.  Hostile Environment, IIED, Due Process and "Class of One"

A reasonable juror could not conclude from the summary
judgment evidence that any defendant is responsible for plaintiff

18 - ORDER

experiencing a discriminatory hostile work environment, or that any defendant's conduct consisted of such an extraordinary transgression of the bounds of socially tolerable conduct as to permit plaintiff to prevail on a claim for infliction of emotional distress.

Any property interest plaintiff may have in his public employment was not impaired without due process by suspension or revocation of standing orders, placement on administrative leave, and issuance of the notice of proposed termination. Suspension with pay avoids the problem of depriving an employee of the very limited pre-termination hearing to which he is entitled. Gilbert v. Homar, 520 U.S. 924, 929 (1997). Plaintiff received constitutionally sufficient notice and opportunity for hearing before defendants imposed a two-day suspension without pay and returned plaintiff to work with restrictions.

Plaintiff's "class of one" equal protection claim is inapplicable to this case, which involves decisions made by a public employer with regard to an employee. Engquist v. Oregon Dept. of Agr., 478 F.3d 985, 996 (9th Cir. 2007), cert. granted, 76 U.S.L.W. 3199 (U.S. Jan. 11, 2008) (No. 07-474). Also, as discussed below, a reasonable juror could not find that defendants' acts regarding plaintiff were malicious, irrational, arbitrary or a pretext for an impermissible motive. Id. at 993.

Plaintiff cannot prevail on his hostile work environment,

IIED, due process and class of one equal protection claims.

II.  <u>Disparate Treatment & Equal Protection Claims</u>

To prevail on a claim of disparate treatment in violation of Title VII, plaintiff must prove by a preponderance of the evidence that his sex, race or color was the sole reason or a motivating factor for an adverse employment action.  <u>Costa v. Desert Palace, Inc.</u>, 299 F.3d 838, 847-48 (9th Cir. 2002).  An individual suffers disparate treatment when he is treated less favorably than others similarly situated on account of sex, race or color.  <u>McGinest v. GTE Service Corp.</u>, 360 F.3d 1103, 1121 (9th Cir. 2004).  On summary judgment, a plaintiff alleging a Title VII claim may proceed under the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973), or may simply produce sufficient evidence for the jury to determine by a preponderance of the evidence that a discriminatory reason motivated the employer.  <u>McGinest</u>, 360 F.3d at 1122, & n.16. When an employer produces a legitimate non-discriminatory reason for adverse action against a plaintiff who is a member of a protected class, the choice of approach has little significance. <u>Id</u>. at 1123.  Under either approach, the plaintiff must produce sufficient evidence for a reasonable juror to find, despite the defendant's evidence, that the defendant intended to discriminate against the plaintiff.  <u>Id</u>.  Analysis of plaintiff's claim under 42 U.S.C. § 1981 and his equal protection claim under 42 U.S.C. §

20 - ORDER

1983 follows these principles.  Fonseca v. Sysco Food Svcs. of
Arizona, 374 F.3d 840, 850 (9th Cir. 2004); Federal Deposit Ins.
Corp. v. Henderson, 940 F.2d 465, 472, n.14 (9th Cir. 1991).

Plaintiff contends that defendants treated him differently
than similarly situated female and/or Caucasian employees by
denying him access to an engineer development training program
and subjecting him to written reprimand for his conduct toward
Torkelson, and by taking the following actions after the
intubation: suspending and revoking plaintiff's standing orders;
reporting findings concerning plaintiff to the state Department
of Human Services; placing plaintiff on administrative leave;
issuing a notice of proposed termination; and subjecting
plaintiff to an unpaid two-day suspension.  Plaintiff further
contends he is the only paramedic ever disciplined for a charting
error and improper intubation.  Plaintiff further contends that
the following additional investigatory acts or omissions
constitute adverse discriminatory employment actions: Zaludek's
failure to interview Chris Paskett and Ted Cole regarding the
July 21, 2005 conflict between Torkelson and plaintiff; Zaludek's
denial of plaintiff's request for a break during an interview;
and defendants' failure to instruct department employees against
retaliating against plaintiff for his complaints of
discrimination.

No reasonable juror could conclude that defendants took

21 - ORDER

adverse employment actions against plaintiff because of his sex, race or color, or that employees treated differently than plaintiff were similarly situated to plaintiff.

Plaintiff testified that he felt he was unable to participate in the engineer development program as a result of the investigation of the intubation incident, and that he did not claim that denial of the program was an independent discriminatory act.  Pl's ex. 1 at 10 (Place depo. at 63:11-20). Plaintiff was not similarly situated to Anna Torkelson.  At the time of the conflict between plaintiff and Torkelson, plaintiff was on a written reprimand disciplinary step, while Torkelson, a probationary employee in her first year of employment, had no prior discipline.  This explains why Torkelson received coaching or documented counseling, while plaintiff received a "reset" of the time-frame for the written reprimand disciplinary step, in lieu of suspension, the next step.  Pl's ex. 2 (Groves Depo. at 57:3-58:9).  Plaintiff concedes that Zaludek received input from Paskett and plaintiff before imposing discipline for the conflict between Torkelson and plaintiff.  Any failure of Zaludek to more formally interview Paskett and Cole does not rise to the level of an adverse employment action.

It is undisputed that Dr. Kozak's call for review prompted the investigation of the June 2005 intubation incident. Plaintiff testified that he did not believe that Dr. Kozak

22 - ORDER

initiated the investigation due to discrimination based on his gender or heritage.  Pl's ex. 1 at 5 (Place depo. 42:10 - 43:23). Plaintiff appears to claim that defendants concealed the fact that plaintiff was the driver of the ambulance (and thus not responsible for airway management during transport) from Dr. Kozak, and that Dr. Kozak's incomplete knowledge of plaintiff's role caused him to suspend and later revoke plaintiff's standing orders.  Plaintiff claims that defendants' knowledge of his limited role is disclosed on the medical chart.  It is undisputed that Dr. Kozak himself passed the chart to Matt Shuler, and that Groves informed Dr. Kozak by e-mail no later than September 13, 2005, that plaintiff was the driver and may not have been in the back of the ambulance for the ride to the hospital.

Whether defendants or Dr. Kozak initiated the full review of plaintiff's file, a reasonable juror could not conclude that plaintiff's sex, race or color motivated the review in light of defendants' evidence that plaintiff's history of discipline and Dr. Kozak's observations prompted the review.  Even plaintiff felt the need to apologize to Dr. Kozak for his tone and demeanor during past encounters.  Pl's ex. 1 at 73.

The reasons for Kamppi's September 30, 2005, report to the Department of Human Services are disclosed in the report and discussed above.  Plaintiff disputes the finding that he misplaced the endotracheal tube, and the statement in the report

23 - ORDER

that all the incidents mentioned in the report have been
thoroughly documented and investigated.  Even if plaintiff
correctly placed the tube, an assertion for which there is no
corroborating evidence, nothing indicates that Kamppi's findings
are a pretext for discrimination.  It is undisputed that the tube
was too deep prior to transport and upon arrival at the hospital.
Zaludek interviewed plaintiff, Deininger and Stott prior to
September 30, 2005.

Plaintiff's contention that he is the only paramedic ever
disciplined for a charting error or improper intubation is inapt.
Plaintiff was not disciplined for these reasons and no others.
Groves found that plaintiff failed to use end tidal $CO_2$
monitoring or capnography, plaintiff has a history of
disrespectful communications with Dr. Kozak and co-workers,
plaintiff has a history of documented errors in patient care, and
plaintiff was on a written reprimand disciplinary step prior to
the suspension.  Plaintiff provides no evidence to prove that
Deininger, Stott and two paramedics involved in an allegedly
improper 2004 intubation incident have sufficiently comparable
records so as to be similarly situated to plaintiff.

III.  Claims under FMLA, OFLA & Or. Rev. Stat. § 659A.040.

Plaintiff alleges that the city interfered with his right to
leave under the federal Family and Medical Leave Act (FMLA) and
the Oregon Family Leave Act (OFLA) by placing him on paid

administrative leave shortly after he took medical leave. Plaintiff further alleges that his placement on paid administrative leave constitutes unlawful retaliation for taking leave and for filing for worker's compensation benefits.

To the extent possible, OFLA provisions are construed in a manner consistent with similar FMLA provisions.  Or. Rev. Stat. § 659A.186(2).  FMLA's anti-retaliation and anti-discrimination provisions do not cover "visiting negative consequences on an employee" for use of FMLA leave.  Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001).  Paid administrative leave is not an adverse employment action giving rise to a FMLA interference claim.  Foraker v. Apollo Group, Inc., 427 F. Supp. 2d 936, 942 (D. Ariz. 2006).  Finding no contrary authority from Oregon's courts, the court further holds that placement on paid administrative leave in the circumstances of this case does not interfere with plaintiff's right to OFLA leave, and does not constitute unlawful retaliation or discrimination for activity protected by OFLA or Section 659A.040 of the Oregon Revised Statutes.  Furthermore, plaintiff's argument that Groves imposed administrative leave for fear plaintiff might become violent in the workplace undermines the allegation that plaintiff's use of leave or application for worker's compensation benefits prompted defendants to impose administrative leave.  Pl's Memo. at 42.

25 - ORDER

IV.   <u>Title VII Retaliation Claims</u>

       Title VII prohibits retaliation against an employee who
opposes unlawful discrimination.  <u>McGinest</u>, 360 F.3d at 1124.  To
prevail, the plaintiff must prove that he engaged in protected
conduct and that the employer subjected him to an adverse
employment action because of the protected conduct, or that the
protected conduct was a motivating factor for the adverse
employment action.  <u>Costa</u>, 299 F.3d at 856-57.  Opposition to a
practice prohibited by Title VII is protected conduct.
<u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 126 S.Ct.
2405, 2415 (2006).  An adverse employment action is an action
that might dissuade a reasonable worker from engaging in
protected conduct.  <u>Id</u>.

       Plaintiff identifies several retaliatory actions he believes
were caused or motivated by certain protected activities.  First,
plaintiff asserts that defendants provided facts to Dr. Kozak in
retaliation for his October 8, 2005, complaint to Zaludek, via
Scott Olmos, that he felt he was being harassed because he is
Hispanic.  Plaintiff contends that these facts caused Dr. Kozak
to revoke his standing orders on October 14, 2005.  Plaintiff
also contends that Groves retaliated against him for this
complaint by placing him on paid administrative leave on October
12, 2005.  In view of the evidence that the Dr. Kozak's
observations and plaintiff's history of discipline prompted a

review of plaintiff's performance, a reasonable juror could not conclude that defendants provided Dr. Kozak with information or placed plaintiff on leave in retaliation for this indirect complaint of discrimination.  Furthermore, paid administrative leave would not deter a reasonable worker from engaging in protected conduct.

Next, plaintiff asserts that three days after he complained to Groves that he was subjected to selective discipline for the intubation based on his race or color, and that he was disciplined more severely than female employees, Groves retaliated against him by issuing the notice of proposed termination.  To the extent the notice of proposed termination is an adverse employment action, a reasonable juror could not conclude that Groves issued the notice of proposed termination in retaliation for plaintiff's complaints, rather than for the legitimate reasons stated in the notice, including that Dr. Kozak had revoked his standing orders.

Next, plaintiff appears to claim that after he sent an e-mail to Groves on November 8, 2005, in which he stated his intent to take his complaints to the city manager, mayor and media, Chouinard retaliated against him by designating Groves as the point person for any media contacts regarding plaintiff's complaints.  Plaintiff does not point to evidence as to when or how he received notice of Chouinard's designation of Chouinard.

Nor does plaintiff explain the impact of the designation. Regardless, the designation of a person to whom a worker directed complaints as a contact for media inquiries regarding the complaints would not deter a reasonable worker from engaging in conduct protected by Title VII.

Finally, plaintiff argues that he was the only EFD employee disciplined for an intubation.  Plaintiff does not connect this discipline to protected activity.  As noted above, plaintiff's conduct regarding the intubation was one of several factors cited in the memorandum notice of suspension.  A reasonable juror could not conclude that defendants subjected plaintiff to discipline in retaliation for protected activity, rather for the reasons stated in the memorandum notice of suspension, including plaintiff's

///

///

///

///

///

///

28 - ORDER

conduct toward Dr. Kozak, for which plaintiff himself felt the need to apologize to Dr. Kozak.

Defendants are entitled to summary judgment on each of plaintiff's claims.

Conclusion

Based on the foregoing, defendants' motion for summary judgment [#46] is granted; defendants' motion to strike [#62] is denied as moot.  This action is dismissed.

IT IS SO ORDERED.

DATED this __13th__ day of February, 2008.


                                        s/ Michael R. Hogan
                                   United States District Judge

29 - ORDER